IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| William Joseph Hanrahan | : | CIVIL ACTION |
| v. | : | NO. 14-06562 |
| Blank Rome LLP | : | |
| ---------------------------------------------------------------X | | |
| William Joseph Hanrahan | : | CIVIL ACTION |
| v. | : | NO. 14-06563 |
| Pepper Hamilton LLP | : | |
| ---------------------------------------------------------------X | | |
| William Joseph Hanrahan | : | CIVIL ACTION |
| v. | : | NO. 14-06564 |
| Dechert LLP | : | |

## MEMORANDUM

**PAPPERT, J.**                                                                              October 2, 2015

When he was a law school student, Plaintiff William Joseph Hanrahan ("Hanrahan") interviewed for a summer associate position with several large Philadelphia law firms. After failing to receive a job offer from any of the firms, he sued each of them. Hanrahan, who claims to have a disability, contends the law firms' decision not to hire him violates the Americans with Disabilities Act ("ADA").

Defendants Blank Rome LLP ("Blank Rome"), Pepper Hamilton LLP ("Pepper Hamilton"), and Dechert LLP ("Dechert") (collectively "the law firms") filed separate motions pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the individual complaints filed against them.[1] As each complaint is virtually identical, the Court reviews the separate motions to

---

[1] Hanrahan also sued Morgan, Lewis & Bockius LLP ("Morgan Lewis") in June of 2015. *See generally Hanrahan v. Morgan, Lewis & Bockius LLP*, No. 15-03227 (complaint filed E.D. Pa. 2015). Morgan Lewis filed a motion to dismiss Hanrahan's complaint on September 14, 2015. On October 1, 2015, Hanrahan filed a response to Morgan Lewis' motion as well as a first amended complaint against Morgan Lewis. By separate order today, the Court denied Morgan Lewis' motion without prejudice as moot (ECF No. 10).

1

dismiss together.[2]  For the reasons stated below, the Court grants Defendants' motions and dismisses the complaints with prejudice.[3]

I.

Hanrahan, then a second-year student at the Drexel University Thomas R. Kline School of Law[4] ("Drexel Law"), applied for a 2014 summer associate position at Blank Rome, Pepper Hamilton and Dechert via Drexel Law's online job portal, Symplicity.[5]  (Compl. ¶ 12-13.) Hanrahan alleges he was qualified for each summer associate position because he was a second-year law student and ranked fourth in his class.  (*Id.* ¶ 14-15.)  Hanrahan had "screening" interviews on Drexel Law's campus with Dechert (August 21, 2013), Pepper Hamilton (August 27, 2013), and Blank Rome (September 11, 2013).  (*Id.* ¶ 16.)  He subsequently received correspondence from each law firm declining to extend him a "callback" interview.[6]  (*Id.* ¶ 17.)

Hanrahan subsequently filed complaints with the Equal Opportunity Employment Commission (EEOC) alleging disparate impact discrimination under the ADA, 42 U.S.C. §

---

[2] Each of Hanrahan's complaints allege a disparate impact claim against the law firms.  *See generally Hanrahan v. Blank Rome LLP*, No. 14-6562 (complaint filed E.D. Pa. 2014), *Hanrahan v. Pepper Hamilton LLP*, No. 14-6563 (complaint filed E.D. Pa. 2014), and *Hanrahan v. Dechert LLP*, No. 14-6564 (complaint filed E.D. Pa. 2014).  In response to the law firms' initial motions to dismiss, Hanrahan amended his complaints.  In his suit against Dechert, he amended the complaint twice.  Each amended complaint is largely duplicative of the previous. The only material difference in any of the complaints is the addition of a disparate impact race discrimination claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, et seq., which Hanrahan asserted only against Pepper Hamilton.  Hanrahan agreed to dismiss this claim in the first page of his memorandum in opposition to Pepper Hamilton's motion to dismiss his first amendment complaint. (Pls.' Opp'n to Pepper Hamilton Mot. to Dismiss First Am. Compl. 1.)
[3] This opinion refers to joint citations to the three complaints as "(Compl.)," while individual citations are noted by the defendant, e.g., "(Blank Rome Compl.)."
[4] Drexel University's School of Law was named the "Drexel University Earle Mack School of Law" until 2013.  It became the "Drexel University Thomas R. Kline School of Law" in 2014. (Compl. ¶ 1.)
[5] Hanrahan applied to each law firm during the months of July and August of 2013.  (Compl. ¶ 12-13.)
[6] Hanrahan received a rejection letter from Dechert on September 4, 2013, a rejection email from Pepper Hamilton on September 5, 2013, and a rejection email from Blank Rome on September 13, 2013. (Compl. ¶ 17.)

2

12112(a).  (*Id.* ¶ 18.)  In each case, the EEOC mailed Hanrahan a notice of dismissal and his right to file a lawsuit within ninety days.[7]  (*Id.* ¶ 19.)

He thereafter sued the law firms, alleging that each firm's hiring practices violate the ADA, 42 U.S.C. § 1201, et. seq.  (Compl. at Prayer for Relief ¶ 1.)  Hanrahan contends that he has two disabilities within the scope of 42 U.S.C. § 12102(1)(A):  Asperger's Syndrome, an Autism Spectrum Disorder, and a "concomitant non-verbal learning disability."  (Compl. ¶¶ 21-22.)  He seeks declaratory relief, injunctive relief, and damages.  (Compl. at Prayer for Relief ¶¶ 1-6.)

Hanrahan makes several allegations in support of his claim against the law firms.  First, he notes that for the 2013-2014 academic year, Drexel Law had a higher percentage of disabled students (14/420 or 3.3%) than Temple University Beasley School of Law (Temple Law) (17/769 or 2.2%) and the University of Pennsylvania Law School (Penn Law) (1/774 or 0.1%).  (Compl. ¶¶ 27-29.)  Hanrahan contends that the law firms prefer Temple Law and Penn Law students over Drexel Law students, because they are ranked higher in the U.S. News and World Report Rankings (USNWR) (56th and 7th respectively) than Drexel Law (126th).  (*Id.* ¶¶ 33-35.)

Hanrahan argues that a law school applicant's Law School Admission Test ("LSAT") score is "the single most important criteria that almost all law schools use for determining which applicants will be offered admission and how much, if any, scholarship money those candidates will be offered."  (*Id.* ¶¶ 35-36.)  He contends the Law School Admissions Council ("LSAC")

---

[7]   Blank Rome's motion to dismiss Hanrahan's complaint and first amended complaint and Dechert's motion to dismiss Hanrahan's first and second amended complaints raise the argument that Hanrahan failed to satisfy the ninety-day deadline to file a civil action under the ADA, 42 U.S.C. § 2000e-5(f)(1) (Blank Rome Mot. to Dismiss Compl. 5-6; Blank Rome Mot. to Dismiss First Am. Compl. 7-9; Dechert Mot. to Dismiss First Am. Compl. 5-7; Dechert Mot. to Dismiss Second Am. Compl. 8-10.)  Because the Court dismisses Hanrahan's complaints on other grounds, it is unnecessary to address this issue.

has a history of administering the LSAT in a manner that disadvantages disabled test takers. (*Id.* ¶¶ 36-37.) Specifically, Hanrahan asserts that the LSAC denied many disabled examinees the accommodations to which they were entitled under the ADA and annotated the scores of those examinees who received the accommodation of extra time in which to complete the exam. (*Id.*) He equates this to the LSAC "telling law schools to discount the value and/or validity of the annotated score as compared to the non-annotated scores." (*Id.*) Hanrahan asserts that "some, if not most, disabled law students" were refused admission to higher-ranked law schools, and that those students enrolled in lower-ranked schools instead. (*Id.* ¶¶ 38-39.)

     Hanrahan alleges he was entitled to accommodations under the ADA when taking the LSAT, but failed to request them, as he "did not want to be a victim of LSAC's aforementioned illegal practice of annotating certain accommodated test scores." (Blank Rome, Pepper Hamilton First Am. Compl. ¶ 39; Dechert Second Am. Compl. ¶ 39.) Hanrahan states he received an LSAT score of 155 and presumes it would have been "substantially higher" had he received an accommodation of additional time and had that accommodation not been reported to the law schools to which he applied. (Blank Rome, Pepper Hamilton First Am. Compl. ¶ 40; Dechert Second Am. Compl. ¶ 40.) Furthermore, Hanrahan acknowledges that he applied to Temple Law and Drexel Law, but not Penn Law, because it would have been "futile" to do so given his low LSAT score. (Blank Rome, Pepper Hamilton First Am. Compl. ¶ 41; Dechert Second Am. Compl. ¶ 41.) Hanrahan asserts if he had scored higher on the LSAT, he would have been admitted to Temple Law or Penn Law. (Blank Rome, Pepper Hamilton First Am. Compl. ¶ 42; Dechert Second Am. Compl. ¶ 42.) Finally, he alleges that if he had been admitted to Temple Law or Penn Law, each law firm would "probably" have offered him a summer associate

position.  (Blank Rome, Pepper Hamilton First Am. Compl. ¶¶ 43-44; Dechert Second Am. Compl. ¶¶ 43-44.)

II.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead factual allegations sufficient "to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The "mere possibility of misconduct" is not enough.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  The complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Id.* at 678.  (quotation and citation omitted).  Speculative and conclusory statements are not enough.  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions . . . a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

Furthermore, the court must construe the complaint in the light most favorable to the plaintiff.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010) (quoting *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009)).  However, while all allegations contained in the complaint must be accepted as true, the court need not give credence to mere "legal conclusions" couched as facts.  *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice."  *Id.*

Finally, a court should "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim."  *Lum v.*

*Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004). Whether a complaint states a plausible claim for relief is a context-specific task that "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

III.

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined by the ADA as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that individual holds or desires." 42 U.S.C. § 12111(8).

Hanrahan pursues a claim for disparate impact discrimination under the ADA.[8] (Compl. ¶ 18.) He bases his disparate impact claim on 42 U.S.C. § 12112(b)(6), which prohibits employers from:

> [U]sing qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

---

[8] Under the ADA, a plaintiff may bring a claim for disparate treatment or disparate impact. To allege a prima facie case under the ADA for disparate treatment in hiring, a plaintiff must show that: (1) he belongs to a protected category; (2) he applied for and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications, was rejected; and (4) after his rejection, the position remained open and the employer continued to seek applicants. *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996) (citing *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061 (3d Cir. 1996) (en banc)). Hanrahan's complaint does not make any attempt to allege disparate treatment.

To establish a prima facie claim of a disparate impact, a plaintiff must show that a facially neutral employment practice or policy resulted in a significantly discriminatory hiring pattern. *Lanning v. SEPTA*, 181 F.3d 478, 485 (3d Cir. 1999). If the plaintiff establishes a prima facie case, the burden shifts to the employer to show that the employment practice is "job related for the position in question and consistent with business necessity . . . ." 42 U.S.C. § 2000e-2(k). If the employer meets this burden, the plaintiff may still prevail if she can show that an alternative employment practice has a less disparate impact and would also serve the employer's legitimate business interest. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975).

A plaintiff must therefore meet two requirements to establish a prima facie case of disparate impact discrimination. First, the plaintiff must identify a specific employment practice or policy to challenge. *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994 (1988). Second, the plaintiff must demonstrate causation by offering statistical evidence sufficient to show that the practice or policy resulted in discrimination. *Id.* Hanrahan does neither.

First, Hanrahan must isolate a *specific* employment practice or policy. This is "not a trivial burden . . . ." *Meacham v. Knolls Atomic Power Lab*, 554 U.S. 84, 100 (2008). Such a policy must be more than simply "point[ing] to a generalized policy that leads to such an impact." *Id.* (quoting *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005)). "[I]t is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *City of Jackson*, 544 U.S. at 241. This burden exists to avoid the result of employers being potentially liable for "the myriad of innocent causes that may lead to statistical imbalances." *Id.* (quotation and citation omitted).

7

Here, Hanrahan seems to point to a shared practice or policy of the law firms: that Drexel Law students, along with students at other "lower-ranked" law schools, are not hired at the same rate as Temple Law and Penn Law students. (Blank Rome, Pepper Hamilton, Dechert First Am. Compl. ¶¶ 31-33.)

Hanrahan however fails to identify a *specific* employment practice or policy. Simply because he refers to his own generalized observation as a "practice" or "policy" does not make it so. Nowhere in his complaints does he reference a practice or policy of the law firms. He instead recites his own theory of how or why the law firms hired applicants for only the 2013-2014 academic year.

Second, Hanrahan must show causation by statistical evidence sufficient to prove that the practice or policy resulted in discrimination. *Watson*, 487 U.S. at 994. The Supreme Court recently addressed the adequacy of disparate impact claims at the pleading stage in the context of the Fair Housing Act in *Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc*. The Court noted, "[a] plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, No. 13-1371, slip op. at 20 (June 25, 2015).

Here, Hanrahan offers two categories of statistics, neither of which pertain to the law firms. First, he cites the National Association for Law Placement ("NALP") statistics for the 2013-14 academic year. During that year, Drexel Law had a slightly higher percentage of disabled students (3.3%) than Temple Law (2.2%) and the Penn Law (0.1%). (Compl. ¶¶ 27-29.) Second, Hanrahan asserts that the LSAC has a history of unlawful discrimination against

8

disabled LSAT examinees. Specifically, he contends that the LSAC denied many disabled examinees the accommodations to which they were entitled under the ADA and annotated the scores of examinees that received extra time as an ADA accommodation. Hanrahan alleges this equates to the LSAC "telling law schools to discount the value and/or validity of the annotated score as compared to the non-annotated scores." (Compl. ¶¶ 36-37.) He then assumes that "some, if not most, disabled law students" were refused admission to higher-ranked law schools, and that those students enrolled in lower-ranked schools instead. (Compl. ¶¶ 38-39.)

First of all, Hanrahan's dissatisfaction with the LSAC and its alleged administration of the LSAT has no relation to the law firms or any employment practices or policies they may or may not utilize. More to the point, Hanrahan fails to show causation through his cited statistics for several reasons. First, he fails to identify a proper applicant pool. *Meditz v. City of Newark*, 658 F.3d 364, 370 (3d Cir. 2011). He cites data from only the 2013-2014 academic year, while including the entire student body of each law school. Additionally, Hanrahan arbitrarily limits the applicant pool to Drexel Law, Temple Law, and Penn Law.

Second, Hanrahan fails to show that the statistical disparity among disabled students at Drexel Law, Temple Law, and Penn Law is substantial. "[S]tatistical disparities must be sufficiently substantial" to raise "an inference of causation." *Watson*, 487 U.S. at 994-95. Hanrahan asserts that during the 2013-2014 academic year there were 32 disabled law students out of 1,963 total law students at Drexel Law, Temple Law, and Penn Law.[9] Of the 32 disabled law students, 44% attended Drexel Law, while 56% attended Temple Law and Penn Law. While Hanrahan points out that Drexel Law had a higher number and percentage of disabled students

---

[9] There is no substantial statistical disparity between the percentage of disabled students at Drexel Law (3.3%) in comparison to Temple Law (2.2%) and Penn Law (0.1%).

than Temple Law or Penn Law, he neglects an outgrowth of his allegations.  If Hanrahan's assertion is true that the law firms favor Temple Law and Penn Law students over Drexel Law students, they also favor a majority (56%) of the disabled student population at the three schools.  This undermines much of Hanrahan's argument, to the extent that argument is in any way relevant to stating a claim under the ADA against the law firms.

Third, and most glaringly, Hanrahan fails to establish any causation between any practice or policy the law firms may have had and any discriminatory impact such practice or policy may have had on him.  To the contrary, Hanrahan makes several allegations, of varying relation to one another, with nothing connecting them.  Distilling to their essence those conclusory and speculative assertions which pertain to the law firms, Hanrahan's theory of liability against the firms seems to be:  The law firms prefer to hire students from Temple Law and Penn Law over students from Drexel Law; if Hanrahan sought the accommodations to which he was allegedly entitled when sitting for the LSAT, he would have received a higher score on the exam; if he received a higher score on the exam, he would have been accepted at Temple Law and would have applied to, and then been accepted by, Penn Law; if he had attended Temple or Penn Law, he would have done just as well academically as he did at Drexel Law; and if he performed as well at Temple or Penn as he did at Drexel, the law firms would have offered him a job.  Hanrahan's theory obviously rests on numerous assumptions, presumptions, conclusions, outright speculation, and fairly wide leaps of faith.  It does not constitute a prima facie case of disparate impact discrimination under the ADA.  Hanrahan's complaints fall well short of the *Twombly* and *Iqbal* pleading standard and must accordingly be dismissed.

IV.

District courts must permit a curative amendment to dismissed complaints under Rule 12(b)(6), unless such amendment would be inequitable or futile. *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (citations omitted). "Futility" means that the amended complaint would fail to state a claim upon which relief could be granted. *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)). Hanrahan has already amended each of his complaints against the law firms once. He amended his complaint against Pepper Hamilton twice. Hanrahan has not sought leave to amend, but had he done so leave could not be granted because any further amendments of the complaints would be futile and inequitable to the law firms. *See Gadling-Cole v. West Chester Univ.*, 868 F. Supp. 2d 390, 401 (E.D. Pa. 2012) ("The Plaintiff has already amended her complaint once in response to the Defendants' first motion to dismiss, which required the Defendants to file a subsequent motion to dismiss. This amendment failed to cure the above deficiencies and to allow further amendment would be inequitable to the Defendants . . . ."). Due to the fundamental substantive deficiencies in Hanrahan's previously amended complaints, namely a repeated inability to comply with the *Twombly* and *Iqbal* pleading standard, further amendment would be futile.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.

11